Opinion by JUDGE TAUBMAN
*840 ¶ 1 In this dependency and neglect action, mother, L.J.G., appeals the judgment terminating her parent-child relationship with her daughter, C.J.
¶ 2 As the sole issue on appeal, mother contends that the procedures that led the El Paso County Department of Human Services (Department) to recommend against kinship placement violated her rights to due process and assistance of counsel. As a result, she asserts, the trial court improperly determined there was no less drastic alternative to termination of her parental rights.
¶ 3 Because we conclude that the Department did not violate mother's right to due process or her right to counsel, we affirm.
I. Background
¶ 4 The Department filed a petition in dependency and neglect in November 2014 after the child was born addicted to methadone and opiates. The hospital released the child when she was two months old. Due to mother's continued substance abuse, the Department placed the child in foster care a month later.
¶ 5 A paternal aunt contacted the Department about six months later. She was interested in caring for the child but she was concerned that the placement might be disrupted. Accordingly, she asked the Department to establish the child's paternity by a genetic test so she could know whether the child was her blood relative before moving forward.
¶ 6 The Department complied with the aunt's request and found that the child was her blood relative. However, this process took nine months because the Department had been unable to locate the child's father without mother's cooperation, the aunt's test was inconclusive, and the child's grandparents were slow to participate in genetic testing. Thus, the aunt did not begin visits with the child until the child was eighteen months old.
¶ 7 Meanwhile, the Department conducted a home study to evaluate the aunt as a placement option for the child. The caseworker's interview with the aunt raised concerns that prompted the caseworker to request administrative review by the Department.[1] Upon review, the Department decided not to recommend placement with the aunt.
¶ 8 The Department moved to terminate mother's parental rights in June 2016. At the same time, the Department asked the court to reduce visitation with the aunt.
¶ 9 Mother challenged the Department's recommendations. She filed a motion asking the court to increase visitation and to consider the aunt as a permanent placement option for the child.
¶ 10 The court held a hearing on mother's motion. Citing the child's emotional needs, her bond with her foster parents, and her lack of attachment with the aunt, the trial court denied mother's requests. The court terminated parental rights in November 2016.
II. Analysis
A. Placement Procedures
¶ 11 County departments of human services are authorized to evaluate placement options and make recommendations to the court. See §§ 19-3-213, C.R.S. 2017; People in Interest of D.B-J. , 89 P.3d 530, 532 (Colo. App. 2004) (department of human services must evaluate a reasonable number of possible placements). "If kin are available and willing [to care for a child], the county department shall assess the suitability of kin in accordance with the foster care certification requirements." Dep't of Human Servs. Reg. 7.304.21(E)(2)(c), 12 Code Colo. Regs. 2509-4; see also § 19-3-407(6), C.R.S. 2017; Dep't of Human Servs. Reg. 7.500, 12 Code Colo.
*841 Regs. 2509-6; Dep't of Human Servs. Reg. 7.708, 12 Code Colo. Regs. 2509-8.
¶ 12 However, "[i]t is within the exclusive jurisdiction of the court to determine the placement of a child adjudicated neglected, dependent, or delinquent." People in Interest of T.W. , 642 P.2d 16, 17 (Colo. App. 1981) ; see also § 19-3-508, C.R.S. 2017. Thus, a court is not bound by a department's placement recommendations. See T.W. , 642 P.2d at 17-18 ; accord § 19-3-407(3) (court may order county department to place child with kin despite the presence of otherwise disqualifying factors).
¶ 13 The Department evaluates a placement option by conducting a home study. A caseworker visits the home, interviews the potential guardian, and gathers other relevant information. The caseworker may make a recommendation based solely on this investigation. If the investigation reveals complicating factors, the caseworker may meet with other Department staff to discuss the home study before making a recommendation. The Department may invite the child's guardian ad litem (GAL) or court-appointed special advocate to this meeting. The Department calls the meeting an "administrative review."
¶ 14 In this case, the caseworker interviewed the aunt and visited her home. The aunt told the caseworker that she used marijuana to help her eat and relax her throat to keep food down, but she did not have a physician's certification. She had just been sentenced to probation after pleading guilty to fraud. Also, the father of one of her children had a violent criminal background. The caseworker testified that these factors raised safety concerns and implicated Department policy against placing a child with a caregiver who used marijuana.
¶ 15 The aunt also had two children with special needs, a deficit in her monthly budget, and unreliable transportation. The caseworker was concerned that the aunt would not be able to provide for the child without significant support from the Department. She testified that she did not "want to set [the aunt] up for failure."
¶ 16 Thus, the caseworker requested an administrative review. The Department invited the child's GAL to participate in the administrative review. Based on the Department policy then in effect, which barred placement of children with caregivers who used marijuana, the Department determined not to recommend placement with the aunt. The GAL reported this result at a court review hearing the following week. At that hearing, mother did not challenge the Department's recommendation or its administrative review process.
¶ 17 The Department filed three status reports over the next two months, each of which noted the date and outcome of the administrative review. The Department sent the status reports to mother's counsel. Mother did not challenge the placement recommendation.
¶ 18 The aunt began visitation after the child had been in foster care for sixteen months. After the Department moved to terminate parental rights, the Department and the GAL asked the court to reduce or eliminate the aunt's visitation because she was not a viable placement option for the child. Mother did not object. In a written order, the trial court found the aunt was not an appropriate placement and reduced her visitation.
¶ 19 Substitute counsel entered her appearance on mother's behalf the following month. Then-more than four months after the Department reported the outcome of the administrative review-mother asked the court to increase visitation with the aunt and to reconsider her as a permanent placement option. The child was then almost two years old, and she had been in foster care for twenty months.
¶ 20 The court briefly addressed the concerns that had led to the administrative review of the aunt's home study and the Department's initial recommendation against placement with the aunt. Despite these concerns, the court noted that, "had [the aunt] been engaged earlier in the case, [she] very well would have been a very appropriate placement for her niece." The court found that mother was largely responsible for the delay in genetic testing, which had delayed bonding between the aunt and the child.
*842 ¶ 21 However, the bulk of the court's analysis centered on the child's attachment to her foster parents and her lack of attachment to the aunt. Citing the testimony of an evaluator who performed parent-child interactional assessments of the child with the foster parents and the aunt, respectively, the court found:
Of paramount concern and importance and relevancy with regard to [the evaluator]'s testimony is about the attachment issue, which ultimately goes back to the purpose of the Children's Code.... The [c]ourt finds that clearly the foster parents are [the child]'s primary bond attachment. Based on [the evaluator]'s testimony there's a clear bond. There was no ambivalence about the attachment. It's the [foster parents] who[m] [the child] goes to to have her basic nurturing needs met. [The evaluator] clearly observed strengths with regards to [the child]'s visits with [the aunt]. It was positive. They played well. However, there was no bonding. It certainly was an ambivalent attachment as [the child] was apprehensive and anxious.
....
And [the evaluator] went on to corroborate in her testimony the American Academy of Pediatric[s] Study that the [G]eneral [A]ssembly embraced in guiding the courts about placement decisions, that in her opinion attachment with [the f]oster [p]arents is secure; to disrupt this primary attachment could result ultimately in reactive attachment disorder and could impair [the child's] ability to have good relationships going forward. She also addressed and it's of paramount concern to the [c]ourt that the race between the foster parents and [the child] is different, and [the evaluator] did address that. However, at this point of primary concern was the attachment disruption due to the age of [the child].
¶ 22 The court also found that visits with the aunt upset the child.
¶ 23 The court denied the placement change for the following reasons:
• It was not in the child's best interest to disrupt the only primary bond that she had ever been able to form.
• "[T]he effects on the child's emotional wellbeing if this primary bond attachment [were] disrupted [was] a risk that the [G]eneral [A]ssembly urge[d] the [c]ourt to only approach as a matter of urgency and profound importance."
• Disrupting a placement that had been secure for twenty-two months would harm the child.
¶ 24 The court terminated parental rights a month later. In addressing whether placement with the aunt was a viable alternative to termination, the court made the following findings:
• The court's primary task was to balance family placement, cultural issues, the child's young age, and the disruption of her primary attachment bond with the foster family.
• Removing the child from her foster family would require the court to "essentially ignore" the testimony of the caseworker, the child's therapist and expert in children's mental health, and the attachment evaluator, and to ignore the statutory language of section 19-3-100.5, C.R.S. 2017.
• The child had experienced several traumas in her young life. The one consistent factor had been placement with the foster family, with whom she had established a primary attachment.
• The most important focus for the child was stability.
B. Procedural Due Process
¶ 25 We review procedural due process claims de novo. See Klingsheim v. Cordell , 2016 CO 18, ¶ 14, 379 P.3d 270 (lack of notice); Werth v. Heritage Int'l Holdings, PTO , 70 P.3d 627, 629 (Colo. App. 2003) (procedural due process). "[T]o establish a violation of due process, one must first establish a constitutionally protected liberty interest that warrants due process protections." M.S. v. People , 2013 CO 35, ¶ 22, 303 P.3d 102.
¶ 26 Mother contends that the Department's decision to recommend against placement with the aunt adversely affected her *843 fundamental liberty interest in the care, custody, and management of her child. See Santosky v. Kramer , 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ; In re Adoption of T.K.J. , 931 P.2d 488, 494 (Colo. App. 1996). We assume, for the purposes of argument, that this is so. We note, however, that the Department did not propose to change the child's placement. Thus, for purposes of procedural due process, mother was not entitled to notice of the Department's administrative review or a hearing during such review under Colorado law. See § 19-3-213(1)(a) (parent is entitled to notice and prior hearing when department proposes to change child's placement); cf. Dep't of Health v. Donahue , 690 P.2d 243, 249 (Colo. 1984) (when the state imposes more stringent standards on government agencies than are constitutionally required, due process requires agencies to adhere to those standards).
¶ 27 To protect the parental liberty interest, due process requires the state to provide fundamentally fair procedures to a parent in a dependency and neglect proceeding. People in Interest of J.A.S. , 160 P.3d 257, 262 (Colo. App. 2007). "The fundamental requisites of due process are notice and the opportunity to be heard." Hendricks v. Indus. Claim Appeals Office , 809 P.2d 1076, 1077 (Colo. App. 1990). In some circumstances, fundamentally fair procedures may include an evidentiary hearing following adverse administrative action. Mathews v. Eldridge , 424 U.S. 319, 343, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). As discussed below, mother's due process rights were protected by her opportunity to challenge the Department's recommendation at both the motions and termination hearings.
¶ 28 Mother contends that she was denied the opportunity to be heard on the issue of placement. She asserts that if she or her attorney had been present at the Department's administrative review, she could have provided evidence or alternatives to refute the Department's reasons for disapproving the aunt's home study.
¶ 29 However, the record establishes that, at both the motions hearing and the termination hearing, the trial court afforded mother a full opportunity to be heard and to present evidence in contravention of the Department's placement recommendation. Indeed, the trial court implicitly rejected the outcome of the Department's administrative review-which ultimately turned on the aunt's use of marijuana-when it found that placement with the aunt would have been appropriate if she had been engaged earlier in the case. (We note, also, that it is not clear mother's participation in the administrative review would have changed the Department's recommendation. The caseworker testified that, regardless of any other concerns, then-current Department policy barred placing children with a caregiver who used marijuana.)
¶ 30 Thus, we reject mother's contention that she was entitled to participate in the Department's administrative review. As a result, we also reject her contention that she had a right to assistance of counsel during that administrative review. Section 19-3-202(1), C.R.S. 2017, provides that a respondent parent has a right to counsel at "every stage of the proceedings" in dependency and neglect actions. Although the term "proceedings" is not defined in this statute, we think that it does not apply to the Department's administrative review at issue here, especially in light of our conclusion that mother's right to procedural due process was not violated by her lawyer's inability to attend the administrative review.
¶ 31 Mother next contends that she was denied timely notice of the court's review of the Department's administrative review. However, the GAL notified the court and the parties of the Department's administrative review and its outcome at a review hearing less than one week after that administrative review took place.
¶ 32 Mother also asserts that she did not timely receive a copy of the home study. As a result, she contends, she had no notice of the basis for the Department's decision and could not properly challenge it. Nevertheless, mother knew the home study had been completed and did not request a copy of the report until the motions hearing. The Department could not release the home study without a court order or permission from the aunt, so the burden was on mother to request *844 a copy of it. See Dep't of Human Servs. Regs. 7.605.1 & 7.605.2, 12 Code Colo. Regs. 2509-7. Although the aunt had indicated she would sign a release, she had not done so. Instead, she gave permission to release the home study report at the motions hearing.
¶ 33 Thus, procedures existed by which mother could have timely obtained the information she sought and challenged the Department's recommendation. Mother simply did not avail herself of those procedures. Under these circumstances, we are satisfied that the Department did not deny mother due process of law or her right to counsel.
III. Conclusion
¶ 34 The judgment is affirmed.
JUDGE ROMÁN and JUDGE LICHTENSTEIN concur.

The Department's administrative review process is not to be confused with a review conducted by the Administrative Review Division of the Colorado Department of Human Services as part of its statewide oversight of county foster care programs. See Dep't of Human Servs. Reg. 7.304.65, 12 Code Colo. Regs. 2509-4. Also, the Department's administrative review is different from the court's review of the recommendation that resulted from the Department's administrative review. The court's review is not at issue here.